**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **STERLING BV, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | **CASE NO.** _20-1239_ |
| | § | |
| | § | |
| **ANDREA LUPO AND** | § | |
| **LONE STAR BAKERY,** | § | |
| | § | |
| **Defendants.** | § | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

---

Plaintiff Sterling BV, Inc. ("Sterling") hereby files its Original Complaint and Demand for Jury Trial as follows:

## I.  SUMMARY

1.      Sterling brings this lawsuit to prevent the misappropriation of its valuable trade secrets and continued wrongful solicitation of its employees.  An industry leader in the development and production of specialty bakery products, Sterling was founded in 1971 in San Antonio, Texas, in response to as the military's need for quality baked goods with a longer shelf life.  Sterling has become a premier developer and manufacturer of superior, highly customized shelf-stable, frozen, and fresh bakery products for a wide variety of sophisticated and respected clients.  Given the innovation and competition inherent in this type of venture, Sterling requires employees who need access to sensitive information to perform their jobs to sign confidentiality agreements to protect its trade secrets and other confidential and proprietary information and to prevent solicitation of its clients and employees.

2.     In April 2020, Defendant Andrea Lupo ("Lupo") resigned from Sterling, taking with her Sterling's valuable trade secrets and proprietary, highly sensitive, confidential information, which she emailed to her personal email and downloaded to an external, removable USB drive. In blatant disregard of her obligations to Sterling, Lupo took the proprietary information she gained from Sterling to a job with Sterling's direct competitor, Lone Star Bakery, Inc. ("Lone Star" and with Lupo "Defendants"), in a role substantially similar to the role she performed for Sterling. Lupo also actively solicited Sterling employees to join her at Lone Star and succeeded in luring one employee away from Sterling.

3.     As set forth in detail below, Lupo had access to and misappropriated Sterling's trade secrets and confidential and propriety information. Lone Star now employs Lupo and has access to that same information through Lupo. Lupo also solicited Sterling employees for employment at Lone Star in violation of non-solicitation provisions of the confidentiality agreement she entered into with Sterling. These acts constitute statutory violations, breaches of contractual duties and obligations, and torts under Texas law. Sterling therefore files its Original Complaint for violations of the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq*. ("DTSA"), Texas Uniform Trade Secrets Act ("TUTSA"), breach of contract for violation of a non-competition agreement, breach of contract for a non-solicitation provision, and tortious interference with contract.

## II.   <u>PARTIES</u>

4.     Sterling is a Texas limited liability corporation with its principal place of business in San Antonio, Texas.

5.     Lone Star is a Texas corporation with its principal place of business in San Antonio, Texas. The Court has personal jurisdiction over Lone Star because it is at home in Texas and has

minimum contacts with the State of Texas. Specifically, Lone Star is headquartered in Texas and subject to general jurisdiction in Texas. Moreover, Lone Star committed a tort in Texas and targeted its wrongdoings toward Texas. Lone Star may be served with citation by serving its registered agent: Mac S. Morris at 6905 Highway 87 East, China Grove, Texas 78236 or wherever he may be found.

6.     Andrea Lupo is an individual and citizen of the State of Texas who lives at 24106 Viento Road, San Antonio, Texas 78260 or nearby. The Court has personal jurisdiction over Lupo because she is at home in Texas and has minimum contacts with the State of Texas. Specifically, Lupo is a citizen of Texas and resides in Texas and is subject to general jurisdiction in Texas. Moreover, Lupo contracted with Sterling in Texas for services to be performed in Texas, and the contract contains choice of law and exclusive jurisdiction provisions under which Lupo expressly consented to jurisdiction in Texas. Lupo also targeted her wrongdoings towards Texas and damaged Sterling in Texas. She may be served at her residence, her place of work located at 6905 Highway 87 East, China Grove, Texas 78263 or 8100 Highway 87 East, China Grove, Texas 78263, or wherever she may be found.

### III.     JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Specifically, Sterling brings this suit under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA"). The Court has supplemental jurisdiction over Sterling's state law claims under 28 U.S.C. § 1367(a).

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1). Lupo resides in the Western District of Texas and all the defendants reside in Texas as residency is defined in 28 U.S.C. § 1391(c) & (d). Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

Sterling's main operations are located at in San Antonio, and Sterling stores many of the trade secrets addressed below at its offices in San Antonio. Defendants' actions have harmed Sterling in San Antonio.

## IV. FACTUAL BACKGROUND

**A.** **Sterling has valuable trade secrets and proprietary information.**

9. Sterling was founded in 1971 in San Antonio, Texas and has grown to become a premier developer and manufacturer of superior, highly customized shelf-stable, frozen, and fresh bakery products for a wide variety of sophisticated and respected clients, across a variety of end markets. Sterling manufactures and sells proprietary bakery goods to national restaurant chains and their distributors. Sterling has multiple manufacturing facilities located in Texas and California.

10. As a supplier of highly technical manufactured food products, Sterling has established partnerships with a number of nationally known companies. By capitalizing on its product development processes and manufacturing expertise, Sterling provides a proprietary competitive advantage to its branded retail, restaurant, and military customers.

11. Sterling has processes for measuring the quality of its ingredients and its products and has a history of exceeding industry standards with its manufacturing practices and packaging technologies. To maintain the consistently high quality of its products and services, Sterling has high-tech Quality Assurance Laboratories in its production facilities and utilizes the knowledge and experience of those employed in its Research and Development Department.

12. Sterling has become a profitable leader in the industry based, in large part, on valuable trade secrets and confidential and proprietary information consisting of, but not limited to, financial information, marketing information, customer lists, customer information, customer

files, information regarding customers, price lists, sales figures, business plans, inventions, techniques, recipes, formulas, computer files, software programs, processes, systems, concepts, and technological developments.

13.     Sterling uses its trade secrets in interstate and foreign commerce to, among other things, manufacture and sell its products and services from its manufacturing facilities in Texas and California to customers throughout the country.

14.     Sterling agrees to make such trade secrets and other confidential or propriety information available for those employees who require this information to perform their duties. But Sterling takes measures to keep its trade secrets and confidential and proprietary information a secret by requiring that its employees who will need access to sensitive information enter into confidentiality agreements that prohibit employees from using or disclosing such trade secrets or confidential and proprietary information.  Sterling's employees are only able to gain access to its trade secrets and confidential and proprietary information if they agree to abide by the provisions (i.e., covenants) in Sterling's confidentiality agreement, and those employees have a duty not to disclose or use any of Sterling's proprietary information except as provided in the confidentiality agreements.  The confidentiality agreements are the only means by which employees obtain access to Sterling's trade secrets and confidential and proprietary information.  Sterling stores this information electronically, and it can only be accessed by employees with proper log-in credentials (user names and unique passwords).   Additionally, access to Sterling's trade secrets and confidential and proprietary information is limited within Sterling.  Employees are only given access to the information they require for their specific duties, and an employee's supervisor and the Information Technology Department ("IT") must grant access to an employee before an employee is able to access trade secrets and confidential and proprietary information.  Employees

privy to this information are only entitled to access and use this information within the scope of their employment with Sterling.

15. By keeping its trade secrets and confidential information secret, Sterling ensures it maintains a competitive advantage in the industry. Sterling's trade secrets and confidential information include, but are not limited to:

- financial information and reports, marketing information, customer lists, customer information, customer files, information regarding customers, price lists, sales figures, business plans, inventions, techniques, recipes, formulas, computer files, software programs, processes, systems, concepts, and technological developments;

- supplier contact information;

- expired inventory summaries listing expired inventory costs, necessary for Sterling's forecasting procurement needs;

- procurement reports listing finished goods, packaging, and raw material costs;

- idle inventory reports listing aged inventory and including all finished goods (and corresponding sale prices), packaging, and raw material costs;

- inventory summaries listing Sterling's quantity of product on hand;

- reports with product formulas (i.e. secret ingredients and recipes) and costs;

- job requirements detailing production reports for certain job numbers;

- used recipe summaries listing the materials included in the formula for a unique finished good;

- Variance Summary Detail reports, which are reports that include actual and standard costs (including Cost of Goods "COG" details) as well as the selling price of products;

- Reports listing product formulations for unique jobs;

- Cost reports listing certain Sterling products and each products' class (what class of product – e.g., specialty, food service, etc.), group (client), type (the type of product – e.g., muffin), COGS breakdown, the total COGS, the prices, and the margins; and

- Product on Order reports, which are cumbersome spreadsheets of product orders and included the product description, quantity, U/M (the unit of measurement assigned to

the part), price, line value, freight, PO numbers, order dates, dates promised, and vendor.

Sterling's trade secrets and confidential information derive economic value from not being generally known by others in competition with the Sterling. Sterling therefore takes significant measures to keep this information confidential.

16.     Sterling also invests significant resources in training its employees and highly values its employees and the knowledge they possess.

**B.     Lupo joins Sterling and obtains access to Sterling's proprietary information.**

17.     In or around September 2017, Lupo joined Sterling as its Corporate Director of Procurement. In this role, Sterling required Lupo to enter into a confidentiality agreement, which Lupo did on February 1, 2018 (the "Agreement").

18.     Paragraph 3 of Lupo's Agreement prohibits the use and disclosure of Sterling's trade secrets and confidential information:

> 3. Non-Disclosure of Confidential Information. Unless required by law, the Employee agrees that he or she will not, during or after the termination of his or her employment with the Company, use Confidential Information for his or her own benefit or for the benefit of any person, organization or entity, or disclose Confidential Information to any person, organization or entity without express permission from the Company. The term "Confidential Information" includes any trade secret or other confidential or proprietary information that belongs to the Company or that is in the possession, custody or control of the Company, and includes but is not limited to financial information, marketing information, customer lists, customer information, customer files, information regarding customers, price lists, sales figures, business plans, inventions, techniques, recipes, formulas, computer files, software programs, processes, systems, concepts, and technological developments. If the Employee receives at any time a subpoena or request from a governmental agency for information that may be Confidential Information, he or she will promptly notify the Company before disclosing such information.

19.     Paragraph 4 of the Agreement requires that, upon demand by Sterling or upon termination, Lupo must deliver to Sterling any of Sterling's property, including computer disks and drives and all documents or media containing any trade secrets or confidential information in Lupo's control. Upon termination, Lupo was also prohibited from deleting of Sterling's information from any company computer.

20.     Given the value of Sterling's trade secrets and confidential and proprietary information, and employees, paragraph 5 of the Agreement prohibits Lupo from working for a competitor for two (2) years and prohibits Lupo from soliciting Sterling's customers or employees:

> 5. Prohibited Competition and Solicitation.  Recognizing that employment with a competitor or solicitation of customers while not employed by the Company would inevitably and necessarily involve the breach of paragraph 3 by the Employee, the Employee agrees that during his or her employment and for a period of two years immediately following the termination of his or her employment with the Company, Employee will not, either directly or indirectly, himself or herself or through another entity or person, (i) engage himself or for any other person or entity in the Continental United States in the business of manufacturing, producing, packaging, marketing, or selling shelf-stable bakery products (A) to or for use by the military, (B) for military operational rations, or (C) to or for the weight management channel of business, (ii) call on, solicit or attempt to divert, either for Employee or for any other person or entity, any customer of Company of whom Employee became aware from the Company after the execution of this Agreement and with whom the Employee had direct work-related contact during his or her employment with Company, wherever such customers may be located, or (iii) employ or solicit for employment, either on behalf of or for employee or on behalf of or for any other person or entity, any employee of Company.

21.     In her role at Sterling, Lupo had access to Sterling's valuable trade secrets and confidential and proprietary information, including, but not limited to, financial information, marketing information, customer lists, customer information, customer files, information regarding customers, price lists, sales figures, business plans, inventions, techniques, recipes, formulas, computer files, software programs, processes, systems, concepts, supplier lists and contact information, procurement reports, inventory reports, detailed product reports, and technological developments.

22.     As the Corporate Director of Procurement, Lupo was responsible for driving strategy and making tactical decisions around the sourcing and purchasing of equipment, supplies, and services across Sterling.  As Corporate Director of Procurement, Lupo reported directly to the Chief Financial Officer and worked with the executive leadership and managers throughout the organization as a subject matter expert in Purchasing and Supply Chain.  Lupo also worked closely with Sales, Quality Assurance, Production and Research and Development teams to ensure timely

execution of new product development launches. Lupo was also responsible for inventory management, sales and operations planning process, and customer fulfillment functions. In this role, Lupo also managed all attributes of direct material spend including the costs that went into the raw materials and goods (i.e., COGS) to manufacture and produce Sterling's products, sourcing, vendor relationships, scorecards, and settling grievances for over 800 direct material items across multiple plant locations. Some of Lupo's key responsibilities included developing and maintaining Sterling's procurement strategy; evaluating vendors; using the latest procurement trends; developing clear reporting and tracking tools, reports, and analyses; developing a supplier sourcing strategy; and developing and forecasting inventory management and supplier capacity management. Lupo managed a team of individuals including, among others, Caitlin Brosovich (a buyer) as well as a senior buyer, both of whom directly reported to Lupo.

23.     Based on her position with Sterling, Lupo had intimate familiarity with Sterling's product strategies, formulas, and pricing/costing information.

**C.     Lupo resigns and takes Sterling's trade secrets and confidential and propriety information to Lone Star.**

24.     On or about Friday, April 24, 2020, Lupo resigned from Sterling. When asked by her superior where she was going, Lupo refused to tell him. Monday, April 27, 2020 was Lupo's last day at Sterling. During her exit interview, Sterling's Corporate Director of Human Resources reminded Lupo about her obligations under the Agreement, which included the obligation not to: (a) disclose or utilize Sterling's trade secrets or confidential information (¶ 3); (b) directly or indirectly solicit Sterling's customers or employees for a period of two (2) years from the date of termination (¶ 5); and (c) compete with Sterling by going to work for a competitor for a period of two (2) years from the date of termination (¶ 5). Sterling's Corporate Director of Human

Resources additionally instructed Lupo to notify any subsequent employers of her Agreement and its restrictions.

25.     Nevertheless, on or about May 27, 2020, Lupo began working for Lone Star, Sterling's direct competitor located in the same city, as its Director of Supply Chain Strategy and Optimization.  Upon information and belief, Lone Star is a commercial bakery that is also located in San Antonio, Texas with plants located nearby in China Grove, Texas.  Lone Star's website advertises that it can "produce volumes of our best-selling products and ship them nationwide," "one Star Bakery serves many top 200 QSR brands, top 15 foodservice distributors, and top 25 grocery chains. We also co-pack for many top retail food brands American consumers crave," and "Our newest facility is a specially-designed USDA plant with equipment designed to handle mass production."  Lone Star is a direct competitor of Sterling in the manufacturing and sale of proprietary bakery goods to national restaurant chains and their distributors.

26.     As competitors in the same geographic area, Sterling and Lone Star have previously employed one another's former employees in the past when such former employees were no longer bound by non-competition and non-solicitation restrictions.  Upon information and belief, through its hiring of former Sterling employees, Lone Star came to learn of the terms of Sterling's confidentiality agreements—particularly those with employees at Lupo's level of seniority—and was aware of their terms when Lone Star hired Lupo.  In fact, in connection with Lone Star's solicitation of Sterling's Senior Director of Research and Development, Lone Star admitted that it was generally aware of Sterling's agreements and their terms.  Upon information and belief, Lone Star was also aware of Lupo's Agreement and its terms because Sterling's Corporate Director of Human Resources expressly discussed these terms with Lupo at the time of her departure from

Sterling and instructed Lupo to notify any subsequent employers of her Agreement and its restrictions.

27.     Lupo is the Director of Supply Chain Strategy and Optimization for Lone Star serving in a substantially similar role to her role at Sterling. Upon information and belief, Lupo oversees Lone Star's overall supply chain operations, including purchasing and inventory of raw materials, selection of vendors, and distribution of finished goods. Upon information and belief, Lupo interacts with the executive team and collaborates with operations/supply chain leaders to execute Lone Star's initiatives. Upon information and belief, Lupo also oversees the duties and responsibilities of the Purchasing Manager and works closely with Sales, Research and Development, and Quality Assurance. As a Director of Supply Chain Strategy and Optimization, upon information and belief, Lupo evaluates past performance data to forecast needs and production scheduling. Upon information and belief, Lupo is responsible for analyzing supply logistics and COGS. Upon information and belief, Lupo also conducts supply chain due diligence analyzes supply chain data such as forecasts, freight costs, manufacturing costs, capital requirements, and production capacity to develop supply chain optimization models. In short, Lupo has substantially the same job and duties at Lone Star as she did at Sterling.

28.     Unbeknownst to Sterling, Lupo also started actively soliciting Sterling's employees to join her at Lone Star. In or about July or August 2020, Lupo contacted Ms. Brosovich, one of her direct subordinates, to recruit her for a role as a buyer at Lone Star. Lupo's solicitation of Brosovich succeeded and resulting in Brosovich terminating her employment at Sterling and going to work for Lone Star on or about September 2, 2020, as a buyer—i.e., the exact role that she had at Sterling.

29.     On or about August 20, 2020, Lupo also contacted a senior buyer at Sterling, who had been one of Lupo's direct subordinates at Sterling.  Upon information and belief, because the senior buyer previously managed one of Sterling's warehouses, Lupo solicited him for a position as a Warehouse Manager at Lone Star.  Lupo also suggested to him that Lone Star may have a possible new Procurement Manager position available and told him that he should "refresh his resume" to pursue these opportunities.

30.     Tellingly, Lone Star also attempted to recruit Sterling's Senior Director of Research and Development, who was integral to creating and developing Sterling's "formulas" or recipes for its products.  While at Sterling, Lupo worked closely with this Senior Director, and, upon information and belief, Defendants would be unable to utilize certain of Sterling's misappropriate trade secrets and confidential and proprietary information without someone like this Senior Director.

31.     Upon learning of Lupo's employment with Lone Star and solicitations of Sterling employees, on September 3, 2020, Sterling's counsel sent a letter to Lupo informing her that she was directly violating her Agreement by competing with Sterling and by soliciting Sterling's employees.  Sterling also informed Lupo that she may also be violating the Agreement and trade secret laws by using Sterling's trade secrets and confidential and proprietary information to benefit Lone Star and activity contacting Sterling's customers on behalf of Lone Star.  Sterling demanded that Lupo cease and desist from continuing any and all wrongful conduct.  Sterling also requested that Lupo provide information regarding, among other things, her role with Lone Star and names of any Sterling employees or any customers whom Lupo had contacted and request Lupo's written acknowledgment that she would abide by the confidentiality, non-competition, and non-solicitation terms in her Agreement.

32.     In a letter dated September 3, 2020, Sterling also informed Lone Star of Lupo's Agreement with Sterling and that Lupo was in breach of the Agreement. Sterling also expressed concern about Lone Star having access to Sterling's trade secrets and confidential and proprietary information. Sterling requested that Lone Star provide information regarding Lupo's hire date, her role with Lone Star, and customers and employees with whom Lone Star had entered into relationships or solicited for employment since hiring Lupo.

33.     Sterling informed Lone Star that Lupo had taken Sterling's trade secrets and confidential information, and that Lupo was competing with Sterling by working in a substantially similar role to her role at Sterling. Upon information and belief, Lone Star failed to take necessary actions to distance itself from Lupo and continued to employ her in breach of her non-competition obligation to Sterling even though, by working for Lone Star in substantially the same role as she had at Sterling, it was inevitable that Lupo would disclose Sterling's trade secrets and confidential and proprietary information to Lone Star.

34.     Understandably concerned by Lupo's employment with Lone Star and breaches of her Agreement, Sterling undertook a forensic investigation into Lupo's Sterling email account and Sterling computer devices that Lupo used during her employment with Sterling. Although this investigation is continuing, Sterling has discovered that, before leaving Sterling, Lupo took a significant amount of Sterling's trade secrets and confidential and proprietary information without Sterling's knowledge or consent. For no apparent legitimate reason and without Sterling's knowledge and consent, late the night before leaving Sterling, Lupo downloaded to a removable USB drive with the volume serial number 0x541b163d, the following files containing Sterling's highly valuable, sensitive, Sterling trade secrets and proprietary and confidential information in an obvious attempt to gain an improper competitive advantage over Sterling:

- "Contracts.docx," which includes all of Sterling's supplier contact information.

- "310 IC_Expired Inventory Summary.xls," which was a report of all expired inventory costs, necessary for Sterling's reporting and forecasting procurement needs.

- "323.3 Inventory by LPN – Procurement Report.xls," which is a report of all finished goods, packaging, and raw material costs.

- "345 Idle inventory Report.xls," which is a report of aged inventory and includes all finished goods (and corresponding sale prices), packaging, and raw material costs.

- "320 IC_Inventory Summary.xls," which is a report of Sterling's quantity of product on hand.

- "423 Material Line Clearance.xls," which contains product formulas (i.e. ingredients and recipes) and production costs.

- "5001902 – 423 Material Line Clearance.xls," which contains formula information and cost for a specific product – item S001902.

- "414 Job Requirements.xls," which is a production report for a unique job number.

- "511 PM_Where Used Recipe Summary.xls," which is a report that lists all materials used for a unique finished good.

- "2.1-Variance Summary Detail with burden changes.xls," which is a report that includes actual and standard costs (including COGS details) as well as the selling prices of products.

- "420 PD_LineClearance.xls," which includes product formulation for a unique job.

- "ROSS Reports," which, upon information and belief, are financial reports.

35.     Additionally, between 4:27 PM to 5:09 PM on April 27, 2020 (Lupo's last day with Sterling), Lupo sent three (3) emails with Sterling's vendor contact information to her personal email.

36.     Lupo also downloaded four Excel files. Three of the files were "Current Standard Cost Reports." These reports contain a wealth of Sterling's trade secret and confidential and proprietary information including certain Sterling products and each products' class (which class of product – e.g., specialty, food service, etc.), group (client), type (the type of product – e.g.,

muffin), COG breakdown, the total COGS, the prices, and the margins. The fourth file was "Product on Order," a lengthy spreadsheet of product orders that includes the product description, quantity, U/M (the unit of measurement assigned to the part), price, line value, freight, PO numbers, order dates, dates promised, and vendors.

37.     The foregoing information (including Sterling's supplier contact information, product descriptions, product formulas, detailed pricing information showing the COGS, raw material costs, finished material costs, materials used in products, current and expired inventory, and orders placed by customers and the identity of those customers) constitute Sterling's trade secrets and highly confidential and proprietary information and would give Sterling's competitors a substantial and improper advantage in competing with Sterling.

38.     Prior to leaving Sterling, Lupo also deleted multiple one-on-one emails with her Sterling direct reports and executives and other Sterling employees for unknown reasons. Relatedly, prior to her departure from Sterling, Brosovich also appears to have deleted all but two emails that she sent to or received form Lupo from her Sterling email account. The rest of Brosovich's emails appear to remain intact. As such, on October 12, 2020, Sterling's counsel sent Brosovich notice to preserve documents and information.

39.     Upon information and belief, Lupo had no legitimate need or purpose to access and download Sterling's trade secrets and confidential and proprietary information late in the night of the day before her departure from Sterling.

40.     Although Sterling notified Lone Star of Lupo's Agreement and Lupo's multiple violations of the Agreement, Lone Star has failed to provide Sterling with information regarding any measures Lone Star has taken to prevent Lupo from using and disclosing Sterling's trade secrets and proprietary and confidential information in her employment with Lone Star. To the

contrary, because, upon information and belief, Lupo is working in substantially the same role capacity for Lone Star as she was at Sterling, it is inevitable that Lupo will use and disclose and Lone Star has or will have access to Sterling's trade secrets and confidential and proprietary information.

## V.     CAUSES OF ACTION

### Count 1: Misappropriation of Trade Secrets (DTSA) (All Defendants)

41.     Sterling adopts the preceding paragraphs as if fully set forth herein.

42.     The Defend Trade Secrets Act codified at Title 18, Section 1836 of the United States Code provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  Sterling owns trade secrets consisting of:

- financial information and reports, marketing information, customer lists, customer information, customer files, information regarding customers, price lists, sales figures, business plans, inventions, techniques, recipes, formulas, computer files, software programs, processes, systems, concepts, and technological developments;

- supplier contact information;

- expired inventory summaries listing expired inventory costs, necessary for Sterling reporting and forecasting procurement needs;

- procurement reports listing finished goods (and corresponding sale prices), packaging, and raw material costs;

- idle inventory reports listing aged inventory and including all finished goods, packaging, and raw material costs;

- inventory summaries listing Sterling's quantity of product on hand;

- reports with product formulas (i.e. secret ingredients and recipes) and costs;

- job requirements detailing production reports for certain job numbers;

- used recipe summaries listing all materials used for a unique finished good;

- Variance Summary Detail, which a report that includes actual and standard costs (including COG details) as well as the selling price of products;

- Reports listing product formulations for unique jobs;

- Cost reports listing certain Sterling products and each products' class (what class of product – e.g., specialty, food service, etc.), group (client), type (the type of product – e.g., muffin), COG breakdown, the total COGs, the prices, and the margins; and

- Product on Order reports, which are cumbersome spreadsheets of product orders and included the product description, quantity, U/M (the unit of measurement assigned to the part), price, line value, freight, PO numbers, order dates, dates promised, and vendor.

These materials constitute trade secrets under the DTSA.

43. These materials are of independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information because this information enables Sterling to forecast trends, develop business, and create and specialize technologies and business strategies that give it a competitive advantage in its industry. For example, Sterling's reports listing its products, the formulas for the materials and recipes for the products, detailed cost breakdowns related to the manufacture and sale of such products, inventory plans, customers, and supplier contacts are all highly valuable information integral to Sterling's business model. This information in the hands of a competitor would put Sterling at an enormous disadvantage.

44. Sterling takes significant measures to maintain the secrecy of its trade secrets by, among other things: requiring employees to sign confidentiality agreements, restricting access to its trade secrets and confidential information until an employee enters into such an agreement, requiring user identifications and passwords for accessing the information, limiting access to its trade secrets and confidential information to that which is necessary for an employee to perform

his or her duties, requiring approval by the employee's supervisor and the IT department, and reminding employees of their obligations not to disclose such obligations upon their departure from Sterling.

45. The parties also agreed that employment with a competitor or solicitation of customers while not employed at Sterling "would inevitably and necessarily involve the breach of [paragraph 3's non-disclosure obligations] by the Employee."

46. Sterling uses the trade secrets themselves in interstate and foreign commerce to, among other things, sell its products and service from its manufacturing facilities in Texas and California to vendors throughout the country. Sterling has used its trade secrets in Texas to develop new products, business strategies, and proprietary formulas.

47. Upon information and belief, Lupo and Lone Star have misappropriated Sterling's valuable trade secrets by acquiring and/or using, among other trade secrets, Sterling's financial information, marketing information, customer lists, customer information, customer files, information regarding customers, price lists, sales figures, business plans, inventions, techniques, recipes, formulas, computer files, software programs, processes, systems, concepts, technological developments, contact list, vendor information containing market data and contact information, production reports, procurement reports, inventory reports (which include reports containing certain of Sterling's proprietary formulas), product cost details, and sales prices.

48. Lupo knew she was improperly misappropriating these trade secrets when, late the night before she left Sterling, she surreptitiously downloaded files containing these trade secrets to an external USB drive. Lone Star knew or had reason to know these materials were acquired by theft because they were obtained by Lupo and not Sterling, the owner of the trade secrets. Lupo took Sterling's trade secrets without Sterling's consent.

49. Upon information and belief, Lupo misappropriated Sterling's trade secrets by, among other things, acquiring and/or using the trade secrets when she knew or had reason to know they were acquired by theft and/or in breach or inducement of a breach of a duty to maintain secrecy because, among other things, she stole the trade secrets even though she had agreed not to disclose Sterling's trade secrets, knew the terms of her Agreement with Sterling, and knew the Agreement prohibited the conduct.

50. Lupo owed duties of confidentiality to Sterling under her Agreement, but upon information and belief, by accepting a position with Lone Star, Lupo has disclosed or will disclose and/or has used or will use, Sterling's trade secrets for the benefit of herself and/or Lone Star.

51. Upon information and belief, Lone Star has or will misappropriate Sterling's trade secrets by, among other things, disclosing and/or using the trade secrets without Sterling's express or implied consent when Lone Star acquired the trade secrets by hiring Lupo in a position substantially the same as her position at Sterling and who stole trade secrets and confidential information from Sterling. Upon information and belief, Lupo's role as Director of Supply Chain Strategy and Optimization is substantially the same and has substantially the same duties as her role as Sterling's Corporate Director of Procurement and is therefore directly competitive to Sterling including the companies' overlapping competitive products and customers and prospective customers, and thus Lupo's disclosure and use of Sterling's trade secrets by Lone Star is inevitable. Upon information and belief, Lone Star has failed to take the steps necessary to prevent Lupo from disclosing or using Sterling's trade secrets and confidential information.

52. Sterling has been harmed as a direct and proximate result of Defendants' violations. Sterling has suffered and is continuing to suffer actual losses caused by the misappropriation of its trade secrets, and Sterling is entitled to recover damages for those losses. Sterling's damages

include, but are not limited to, the value of the trade secrets. Sterling is also entitled to recover damages for unjust enrichment caused by the misappropriation of its trade secrets.

53.     Defendants' misappropriation was done willfully and maliciously, and Sterling seeks exemplary damages from Defendants.

54.     As a result of Defendants' willful and malicious violation of the DTSA, Sterling has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work. Sterling seeks to recover such attorney's fees and costs under the DTSA pursuant to 18 U.S.C. § 1836(b)(3)(D).

### Count 2: Misappropriation of Trade Secrets (TUTSA) (All Defendants)

55.     Sterling adopts the preceding paragraphs as if fully set forth herein.

56.     The actions described in the preceding paragraphs above also constitute misappropriation of trade secrets under the Texas Uniform Trade Secret Act ("TUTSA"), codified at Chapter 134A of the Texas Civil Practice and Remedies Code.

57.     Sterling has been harmed as a direct and proximate result of Defendants' violations.

58.     In addition to the relief sought under TUTSA, Sterling also seeks exemplary damages for the willful and malicious misappropriation of its trade secrets.

59.     As a result of Defendants' willful and malicious violation of TUTSA, Sterling has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work. Sterling seeks to recover such attorney's fees and costs under TUTSA pursuant to Section 134A.005 of the Texas Civil Practice and Remedies Code.

### Count 3: Breach of Contract – Lupo (Non-Competition)

60.     Sterling adopts the preceding paragraphs as if fully set forth herein.

61.     The Agreement between Sterling and Lupo is a valid, binding contract.  There was a meeting of the minds as between Sterling and Lupo as to all material terms.  Lupo indicated her acceptance of the terms of the Agreement by executing a physical copy of the Agreement.

62.     Sterling has clearly ascertainable rights and protectable interests in its trade secrets and confidential and proprietary information, its fair competitive position, its relationship with its customers, its customer goodwill, and its employee resources.

63.     The non-competition provisions in the Agreement are reasonably necessary and narrowly tailored to protect Sterling's ascertainable rights and protectable interests.

64.     Sterling has substantially performed all of its obligations under the Agreement by, among other things, providing Lupo employment, benefits, and Sterling's trade secrets and confidential and proprietary information necessary for Lupo to perform her job at Sterling.

65.     Lupo breached the Agreement by, among other things, accepting employment with Lone Star, a direct competitor of Sterling's, less than two (2) years after her termination date from Sterling, which was April 27, 2020.

66.     Lone Star is a direct competitor of Sterling in the manufacturing and sale of proprietary bakery goods to national restaurant chains and their distributors.

67.     Upon information and belief, Lupo performs substantially the same role and has substantially the same duties and responsibilities for Lone Star as she did for Sterling.  Upon information and belief, in both roles, Lupo was (at Sterling) and is (at Lone Star) responsible for: sourcing and procurement; reporting and working with the executive departments; working closely with Sales, Quality Assurance, Production and Research and Development teams; inventory management; customer fulfillment functions; reporting related to the costs of raw materials and goods (COGS, etc.); vendor relationships; developing and maintaining a procurement strategy;

developing a supplier sourcing strategy; and developing and forecasting procurement and production issues.

68.     Sterling has been harmed as a direct and proximate result of Lupo's breaches of her Agreement that have, among other things, enabled her to work for a direct competitor in substantially the same role utilizing her intimate familiarity with Sterling's trade secrets.

69.     Sterling seeks all damages available at law, whether direct or indirect, special or consequential, including, but not limited to, its benefit of the bargain damages, lost profits, and all incidental and consequential damages reasonably foreseeable as a result of the breaches.

70.     Additionally, as a result of Lupo's breaches of the Agreement, Sterling has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work.  Sterling seeks to recover such attorney's fees and costs pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.

## Count 4: Breach of Contract – Lupo (Non-Solicitation)

71.     Sterling adopts the preceding paragraphs as if fully set forth herein.

72.     The Agreement between Sterling and Lupo is a valid, binding contract.  There was a meeting of the minds as between Sterling and Lupo as to all material terms.  Lupo indicated her acceptance of the terms of the Agreement by executing a physical copy of the Agreement.

73.     Sterling has clearly ascertainable rights and protectable interests in its confidential information, its fair competitive position, its relationship with its customers, its customer goodwill, and its employee resources.

74.     The non-solicitation provision in the Agreement is reasonably necessary and narrowly tailored to protect Sterling's ascertainable rights and protectable interests.

75.     Sterling has substantially performed all of its obligations under the Agreement by, among other things, providing Lupo employment, benefits, and Sterling's trade secrets and confidential and proprietary information necessary for Lupo to perform her job at Sterling.

76.     Upon information and belief, Lupo breached the Agreement by, among other things, soliciting for employment on behalf of Lone Star, Sterling employees less than year after her termination date from Sterling, which was April 27, 2020.   Lupo actively solicited Sterling's employees to join her at Lone Star, including two of whom were her direct subordinates while at Sterling.   In or about July or August 2020, Lupo contacted Ms. Brosovich, one of her direct subordinates, to recruit her for a role as a buyer at Lone Star, which Brosovich accepted.   On or about August 20, 2020, Lupo contacted another of her direct subordinates at Sterling, a senior buyer.

77.     Sterling seeks all damages available at law, whether direct or indirect, special or consequential, including, but not limited to, its benefit of the bargain damages, lost profits, and all incidental and consequential damages reasonably foreseeable as a result of the breaches.

78.      Additionally, as a result of Lupo's breaches of the Agreement, Sterling has had to retain counsel to enforce its rights and has agreed to pay counsel a reasonable fee for necessary work.   Sterling seeks to recover such attorney's fees and costs pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.

### Count 5: Tortious Interference with Contract (Lone Star)

79.     Sterling adopts the preceding paragraphs as if fully set forth herein.

80.     The Agreement between Sterling and Lupo is a valid, enforceable contract.

81. Sterling possesses valid and valuable contractual relationships with its employees, like Lupo, and Sterling achieves economic gain as a result of its contractual relationships with its employees.

82. Among other things, Lupo's Agreement restricted her from soliciting Sterling's employees. Lone Star willfully and intentionally, and without justification, interfered with Sterling's Agreement with Lupo. At the time Lupo solicited Brosovich and other Sterling employees, Lupo was acting in the course and scope of her employment with Lone Star and on behalf of Lone Star. Upon information and belief, Lone Star was aware of Lupo's Agreement and its restrictions. Additionally, Lupo's knowledge of her Agreement and its restrictions is imputed to Lone Star.

83. Lone Star's interference proximately caused Sterling's injuries, and Sterling incurred actual damages or losses in an amount to be determined by the trier of fact.

## VI.   INJUNCTIVE RELIEF

84. Sterling adopts the preceding paragraphs as if fully set forth herein.

85. In addition to monetary damages, Sterling seeks preliminary and permanent injunctions pursuant to Federal Rule of Civil Procedure 65, 18 U.S.C. § 1836, and the common law to protect its trade secrets and confidential and proprietary information.

## VII.   JURY DEMAND

86. Sterling demands a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## VIII.   RELIEF REQUESTED

WHEREFORE, Sterling requests that this Court issue summons and demand Defendants to appear herein and, after exercising all appropriate process, grant Sterling the following relief:

(i) all actual, direct, consequential, special, exemplary, and statutory damages to which Sterling is entitled, in an amount to be determined at trial; (ii) reasonable and necessary attorneys' fees and costs as supported by the evidence and causes of action pled herein; (iii) pre-judgment and post-judgment interest at the maximum rates permitted by law; (iv) all injunctive relief, whether by preliminary injunction and/or permanent injunction to which Sterling is entitled; and (v) all such other and further relief, whether at law or in equity, to which Sterling may be justly entitled.

Dated: October 19, 2020                    Respectfully submitted,


                                           */s/ Christopher M. LaVigne*
                                           Christopher M. LaVigne
                                             Texas Bar No. 24026984
                                             lavignec@gtlaw.com
                                           P. William Stark
                                             State Bar No. 24046902
                                             starkb@gtlaw.com
                                           **GREENBERG TRAURIG, LLP**
                                           2200 Ross Avenue, Suite 5200
                                           Dallas, Texas 75201
                                           Telephone: (214) 665-3600
                                           Facsimile: (214) 665-3601

                                           **ATTORNEYS FOR PLAINTIFF**
                                           **STERLING BV, INC.**